**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

In Re:                                                    Bankruptcy No. 21-30038

Robert Leonard Richard Persson,                           Chapter 7

                              Debtor.
_____/

Kip M. Kaler, as Bankruptcy Trustee for the
Bankruptcy Estate of Robert Leonard
Richard Persson,

                    Plaintiff,

          v.                                              Adversary No. 21-07015

Robert Leonard Richard Persson,

                    Defendant.
_____/

**MEMORANDUM AND ORDER**

**I.      INTRODUCTION**

          Kip M. Kaler, Chapter 7 Bankruptcy Trustee, filed an Adversary Complaint

seeking denial of Debtor/Defendant Robert Leonard Richard Persson's discharge under

11 U.S.C. § 727(a)(2), (3) and (4).  The Trustee alleges Debtor failed to maintain

records regarding the disposition of several trailers and a Bobcat skid-steer and

attachments, warranting denial of discharge under 11 U.S.C. § 727(a)(3).  The Trustee

also alleges Debtor failed to disclose $1,800 in cash; anticipated tax refunds; earned but

unpaid compensation; a 2016 tax debt; and the transfer of his interest in Persson

Investments LLC to his father, trailers to friends and relatives and a Bobcat skid-steer

and attachments to his brother-in-law.  Additionally, the Trustee claims Debtor failed to

disclose that he stored a trampoline and a hot tub at a location other than his residence,

1

and he moved this property from the house he owned in Montevideo, Minnesota, to his
parents' storage building. The Trustee claims Debtor concealed some of this property
with intent to hinder, delay or defraud the bankruptcy estate or others by failing to
disclose it, justifying a denial of discharge under section 727(a)(2). He also claims
Debtor's intentional failure to disclose the property listed above in his bankruptcy
schedules and statements is a false oath under section 727(a)(4). In addition, the
Trustee alleges Debtor provided false or incomplete testimony at the Meetings of
Creditors, warranting denial of his discharge under section 727(a)(4). Finally, the
Trustee claims Debtor intentionally misrepresented material facts when Debtor sent the
Trustee a draft tax return which the Trustee alleges was false.

Debtor filed an Answer to the Complaint, denying many of the factual allegations
and providing explanations for the transfer or other disposition of assets. He also
denied his conduct shows intent to hinder, delay or defraud creditors or a knowing and
fraudulent false oath or claim. Additionally, Debtor denied that he failed to maintain
adequate records regarding the disposition of several trailers and a Bobcat skid-steer
and attachments and affirmatively alleged that he provided the Trustee with information
that refutes these allegations. Debtor also alleged several affirmative defenses and
denied that the Trustee is entitled to the remedy he seeks.

The Trustee moved to amend his Adversary Complaint on January 24, 2022, to
allege more factual detail regarding the filing of Debtor's 2020 tax returns and the
refunds Debtor received. The Trustee also added a cause of action under section
727(a)(2)(B). The parties stipulated to allow the amendment, and the Court granted the
Trustee's motion. The Trustee filed his Amended Adversary Complaint on January 25,

2

2022.  Debtor did not file an Amended Answer, but he offered evidence at trial refuting the new allegations in the Amended Complaint.

Trial of this adversary proceeding took place on January 27 and 28, 2022.  For the following reasons, the Court finds in favor of the Trustee on his cause of action under 11 U.S.C. § 727(a)(4).

## II.   BACKGROUND

### A.   <u>Debtor's Work History</u>

Debtor spent a great deal of his professional life working in the automotive sale and repair industry.  At the time he petitioned for bankruptcy relief on January 31, 2021, and at the time of trial, Debtor worked as a Sales Manager for Heartland Automotive, also known as Gateway Chevrolet, in Fargo, North Dakota.  He began working at Gateway Chevrolet in October 2020.  He worked long days, typically leaving his home at 8:00 a.m. and returning at 8:30 p.m.  In January 2021, Debtor earned approximately $6,950 to $8,000 per month in commissions.  At the time, his income at Gateway Chevrolet was based entirely on commissions.

Before accepting employment in Fargo, Debtor owned and managed his own business, Montevideo Auto Center, LLC, in Montevideo, Minnesota, from September 2019 to October 2020.  As part of the business initiation process, Debtor entered into an Asset Purchase Agreement with Allan Adams and/or Adams Motor Company for the purchase of real estate (two buildings located at 702 and 705 W Highway 212,

Montevideo)[1] and other dealership assets for $600,000.[2]  Debtor's friend, Shane Heck,

provided Debtor and/or Montevideo Auto Center $400,000,[3] which Debtor used to make

a down payment to Adams.  Debtor also borrowed $50,000 from his father, Dan

Persson, in September 2019 for working capital[4] and $200,000 from Montevideo

Industrial Development to finance the purchase of real estate.  Debtor opened

Montevideo Auto Center in September 2019.  Stalled sales resulting from the COVID-19

pandemic compelled Debtor to close his business in September 2020 and to liquidate

its assets in September and October 2020.  Allan Adams and/or Adams Motor

---

[1] After he petitioned for bankruptcy relief, Debtor facilitated the sale of one of these buildings.  The bankruptcy estate currently holds $268,587.20 primarily from the sale of this real estate.  Doc. 26.

[2] Debtor entered the Asset Purchase Agreement in his personal capacity even though Montevideo Auto Center, LLC, used the assets, sold the business inventory and deposited the sale proceeds in Montevideo Auto Center's bank account.  He never transferred the assets or debt to Montevideo Auto Center.

[3] During the first Meeting of Creditors and at trial, Debtor characterized the $400,000 as an investment comprised of $323,000 from Shane Heck and $77,000 from H&L Motors, Inc., and Debtor's retirement savings.  Debtor explained that he and Heck initially "thought partnership," but realized that Heck lived too far away to play an active role in the company.  Conversely, Debtor also referred to the $400,000 as a loan. When Debtor liquidated Montevideo Auto Center, he treated the money Heck provided as a loan and reimbursed Heck by allowing Heck to take dealership assets Heck viewed as valuable, including vehicles and equipment.  Heck also received cash disbursements and purchase discounts.  Debtor did not list Heck as a creditor in his bankruptcy schedules, even though he does not believe Heck was paid in full for the money he provided.  According to Debtor, "in [Heck's] eyes," Debtor repaid Heck in full.

[4] According to both Debtor and Dan Persson, Debtor agreed to repay the loan by paying his father $1,000 per month for 60 months.  Debtor failed to make these payments.  At trial, Debtor confirmed no documentation exists memorializing the loan or anticipated repayment plan.  Debtor did not disclose the loan or list his father as a creditor in his schedules.  At trial, Debtor explained that he did not list the debt to his father because he did not consider his father a "legal lender."

Company obtained a judgment in excess of $1,000,000 against Debtor.[5]  Adams

transferred the judgment to Citizens Alliance Bank.[6]

Before opening Montevideo Auto Center, Debtor owned 46.2% of Renville

Chevrolet, LLC, also known as H&L Motors, Inc. in Renville, Minnesota.[7]  2021-02-26

341 Mtg.  Debtor owned and worked at Renville Chevrolet from March 2019 to June

2019.  He and co-owner, Larry Eckhoff, ceased doing business when General Motors

restructured its organization and declined to renew Renville Chevrolet's dealership

agreement.  Additionally, Eckhoff "owed a debt," which ultimately led to the decision to

close the business.  Id.

From December 2015 to December 2018, Debtor worked at RND Services, LLC.

He performed snow removal services for this company until he "ran out of time to do it."

In or about December 2018, the company closed.  Debtor testified that the company

held no assets when it closed and none of the liabilities listed in his bankruptcy

schedules arose from debt related to this business.

---

[5] The record also shows that the Asset Purchase Agreement Debtor entered into
with Allan Adams and/or Adams Motor Company (in which Debtor agreed to assume all
or most of Adams's business liabilities) together with the course of dealing between the
parties resulted in an unfavorable financial outcome for Debtor.

[6] In addition to the Citizens Alliance Bank's judgment, Debtor disclosed
$270,356.41 in nonpriority unsecured debt.

[7] At the February 2021 Meeting of Creditors, Debtor testified that Renville
Chevrolet was a shell; it held no assets and owed no liabilities.  He planned to transfer
assets and liabilities from H&L Motors, the "prior dealership from March 2018 to June
2019," but he never completed the task.

B.    <u>**Debtor's Family**</u>

Debtor is married to Kadie Gillette Persson.  Ms. Persson earned a nursing degree from Minnesota State Community and Technical College in 2016.  She began working part time at Bethany Retirement Living in October 2020 when she, Debtor and their children moved from Montevideo to West Fargo, North Dakota.  Ms. Persson works on an "as needed" basis, earning approximately $300 per month according to Debtor's bankruptcy schedules.  Ms. Persson was not employed during the two years before the Persson family moved to West Fargo.

Debtor and Ms. Persson have four children, who were ages 7, 5, 2 and 10 months at the time of trial.  On January 31, 2021, the day Debtor petitioned for bankruptcy relief, Ms. Persson was expecting their fourth child, who was born on March 4, 2021.  Several years before the bankruptcy petition, medical providers diagnosed their daughter—who was 4 years old at the time—with cancer, requiring chemotherapy treatments and periodic scans.  Ms. Persson testified that she worries about hospital bills totaling in excess of $8,000 from 2017, which are currently "in collections," and new bills that "keep racking up" as a result of ongoing medical treatment.

C.    <u>**Bankruptcy Disclosures**</u>

On the same day he petitioned for bankruptcy relief, Debtor filed his schedules and statements.  Debtor acknowledged that he read the information on the petition, schedules and statements and testified that it was true and accurate to the best of his knowledge at the time his attorney filed the documents.  He also acknowledged that he signed the petition under penalty of perjury.

Debtor amended his schedules and statements on March 11, 2021, August 6, 2021, and January 13, 2022.  At trial, Debtor testified that he amended his schedules frequently to be accurate.

The Trustee conducted the Meeting of Creditors on February 26, 2021, and continued the examination on March 26, 2021, May 6, 2021, May 28, 2021, and July 2, 2021.  The Trustee repeatedly continued the Meeting of Creditors because "he had to get the tax returns because those were going to lead to more questions" about Debtor and his business.  The Trustee also insisted that he did not receive satisfactory answers to his questions about Debtor's property.  Prior to the first Meeting of Creditors, the Trustee sent Debtor a request for documentation relating to property Debtor disclosed in his schedules.  Ex. 15.  The Trustee sent several other letters seeking supplemental information and answers to new issues that arose at the continued Meetings of Creditors or were prompted by discovery and investigation.  See Exs. 17, 18, 19, 20, 28. The Trustee also deposed several witnesses and served written discovery.  After this thorough investigation, he maintains Debtor intentionally failed to disclose information related to the assets discussed below.

Debtor emphasized that he never objected to the continuances, he provided the keys to Montevideo Auto Center and he granted the Trustee access to electronically-stored data and boxes of financial information stored at Montevideo Auto Center. Debtor also testified that he did not hesitate to answer all the Trustee's questions, and he believed he answered all the Trustee's questions truthfully and correctly.

1.   Property Stored in a Place Other Than Debtor's Residence

In response to question 22 in the Statement of Financial Affairs, Debtor represented that he had not stored property in a storage unit or place other than his home within one year before he filed his bankruptcy petition.  At trial, Debtor testified that he answered correctly at the time he filed his bankruptcy petition, "given his understanding at the time."  At the first Meeting of Creditors, Debtor disclosed that appliances formerly located at his home in Montevideo were moved to his sister's shop.[8]  Later, Debtor learned his father or brother moved the appliances, a destroyed trampoline and a broken hot tub from his home in Montevideo to his father's storage building.[9]  Debtor worked and lived in West Fargo at the time his relatives moved the appliances, trampoline and hot tub.  He did not remember when the move(s) occurred. He explained that his relatives were just trying to help.

Debtor categorized the appliances, trampoline and hot tub as "household goods," and amended Schedule A/B and his Statement of Financial Affairs on March 11, 2021, to disclose that these household goods included "items in storage with parents in Montevideo."  Ex. 2.  Debtor represented in both his initial and amended schedules that

---

[8] Debtor explained that his relatives moved the appliances from his former Montevideo home.  The appliances were only two years old at the time, and Debtor thought his family might use them when they moved into a different house.  He did not want the appliances to be sold with the home at a foreclosure sale.  Debtor acknowledged that he knew the appliances had been moved while he, his wife, brother and brother-in-law remodeled the kitchen in the Montevideo house, but he claimed he did not ask anyone to move the appliances to a new location.

[9] Debtor's relatives moved the hot tub to Dan Persson's storage building after Debtor learned the hot tub froze and cracked.  Dan Persson recovered the broken trampoline from Debtor's Montevideo neighbors' field and trees after a windstorm and moved it to his storage building.

he owned $1,700 in household goods and that no single item of household goods exceeded $200 in value.[10]  At trial, he maintained that this was true on the date he filed his petition.

Debtor claimed these items exempt on Schedule C.  The Trustee did not object to Debtor's exemption claim.  Despite this exemption claim, Debtor offered to turn over the trampoline and hot tub to the Trustee.

Debtor also acknowledged at trial that his parents moved playground equipment from his former house in Montevideo to his parents' home, also in Montevideo.  Debtor claims he did not disclose this playground set because his parents own it.

### 2.   $1,800 in Cash

On Schedule A/B, Debtor disclosed that he possessed $0.00 in cash on the petition date, January 31, 2021.  Ex. 1.  At trial, Debtor testified that he believed his answer was correct on the date he petitioned for bankruptcy relief.  Debtor did not ask his wife whether she possessed cash on the date he filed his bankruptcy petition.

In January 2021 and at the time of trial, Debtor and Ms. Persson used only one joint bank account with Cornerstone Bank.  In mid-February, Debtor sent the Trustee

---

[10] Debtor clarified at trial that his disclosure of $1,700 in household goods referred to his 50% ownership interest in this property.  At trial, the Trustee testified that he was concerned about Debtor's failure to list his kitchen appliances, hot tub, trampoline and playground set in response to the question in the Statement of Financial Affairs asking whether Debtor stored property in a place other than his home.  The Trustee also testified that the removal of the appliances, hot tub and playground set "became more and more relevant" because Debtor later provided documents to the Trustee showing "significant valuations of those assets."  The Trustee claimed Debtor minimized the value of this property, but he offered no other evidence supporting this testimony.  At trial, the Trustee conceded that he had not taken possession of this property or attempted to sell it, other than negotiating with Debtor for a buyout of the estate's interest.

the Perssons' Cornerstone Bank statement summarizing transactions between January 16, 2021, and February 12, 2021.  The statement reveals deposits of $800 on February 1, 2021, and $1,000 on February 2, 2021.  Ex. 37.  The Trustee inquired about these deposits in a letter dated February 19, 2021, and during the February 26, 2021, Meeting of Creditors.  Debtor explained that his wife deposited the cash into their joint account.  When the Trustee asked about the source of the cash, Debtor testified: "Truly mattress money. It's something that she had in our safe.  Over the years she just puts away money for rainy days."  When the Trustee asked how to distinguish his wife's cash from Debtor's cash, Debtor answered:  "That's a great question, I would say that would be long enough to the point that it would be considered my money because she was [unintelligible] for awhile."  2021-02-26 341 Mtg.

At trial, Ms. Persson explained that much of the cash came from family members who agreed to loan her money because the Persson family needed it.  She emphasized that, if she were trying to hide the money, she would have kept the cash rather than deposited it.

Debtor amended his schedules to disclose the $1,800 in cash on March 11, 2021.

### 3.    Earned But Unpaid Compensation

Debtor responded "no" to question 30 on Schedule A/B asking whether someone owed him unpaid wages.  Ex. 1 at 14.  Eight days before the first Meeting of Creditors, Debtor provided his "date of filing bank statements" and his paystub showing $8,593 in earned but unpaid wages as of his petition date.  Doc. 26, Exs. 35, 37.  During the first Meeting of Creditors on February 26, 2021, Debtor again disclosed that he received

10

$8,593 in earned but unpaid wages.  His attorney advised the Trustee that Debtor would promptly amend his schedules accordingly.  Less than two weeks later, Debtor filed Amended Schedules listing $8,593 in earned but unpaid wages on Schedule A/B.

At trial, Debtor explained that he did not answer the question accurately on his schedules filed January 31, 2021, because he did not understand his employer owed him unpaid wages on the date he filed his bankruptcy petition.  He did not think commissions due at the end of the month qualified as unpaid wages.  Debtor "took it as somebody did not pay me money they owed me."  After the February Meeting of Creditors, his attorney explained his obligation to disclose anticipated commissions.  Debtor maintained that he "absolutely" would have listed the commissions if he understood the question correctly.[11]

Debtor also explained at trial that it would have been impossible for him to calculate the sum of his unearned commissions on the petition date because they are based on all sales for the month.  He did not learn the sum of his earned but unpaid compensation until he received his February 5, 2021, earnings statement, almost a week after he filed his petition.

4.   Debtor's Interest in Persson Investments LLC and/or Persson Investments Inc.

In response to question 27 on the Statement of Financial Affairs, Debtor disclosed that he was a member of three limited liability companies, including Persson Investments LLC.   In correspondence to the Trustee two days after Debtor filed his schedules and statements, Debtor's counsel advised the Trustee that Dan Persson

---

[11] At trial, the Trustee agreed that it is not uncommon for debtors to omit earned but unpaid wages.

owned Persson Investments.  Debtor's attorney understood that Debtor "is an officer for estate planning purposes – in case his father passes away." Ex. 16.

During the May 6, 2021, Meeting of Creditors, the Trustee questioned Debtor about assets listed on a personal financial statement Debtor believed was prepared for the Small Business Administration to secure a Paycheck Protection Program loan.  The Trustee directed Debtor to the signature on page 3 of the financial statement and asked Debtor if it was his signature.  See Ex. 21.  Debtor responded, "Yes, sir."[12]  Information on the financial statement dated May 5, 2020, indicated Debtor held an interest in a building located at 7038 Highway 7 SW, Montevideo, Minnesota.[13]  When the Trustee asked Debtor about this asset at the May 28, 2021, Meeting of Creditors, Debtor

---

[12] During the May 28, 2021, Meeting of Creditors, Debtor altered his testimony regarding his signature on the financial statement stating, "I signed but that was not the document used."  At trial, Debtor suggested that the signature on the financial statement "could be" his, but he did not "know if it's my signature or not" and, "basing off of my regular signature, it's not actually 100% accurate."  He also claimed the financial statement was inaccurate.  He speculated that his secretary transferred information from a previous financial statement to this document to be helpful.  Debtor also claimed the financial statement was never delivered to the credit union employees who were assisting him with the loan application process.

[13] According to representations on the financial statement, the market value of the building located at 7038 Highway 7 SW, Montevideo, Minnesota, was $114,000, and the mortgage balance totaled $53,000, resulting in $61,000 in equity.  Dan Persson testified that he thinks the property is worth $69,000, the same value as the purchase price he paid in January 2020.  At trial, the Trustee claimed an interest in this property on behalf of bankruptcy estate.  Dan Persson disputes the estate's ownership claim, maintaining that Debtor never owned an interest in Persson Investments.

During the May 28, 2021, Meeting of Creditors, the Trustee asked Debtor whether he received any compensation from Persson Investments.  Debtor explained that the lessor of a portion of Persson Investments' warehouse paid the entity $200 per month in rent.  Dan Persson allowed Debtor to keep this money because Debtor served as groundskeeper of the property.  At trial, Dan Persson claimed Persson Investments never paid Debtor for anything, including snow removal or maintenance.

testified that his father owned the building, although he later acknowledged that Persson Investment owned it.  Debtor's answer prompted the Trustee to ask why an asset owned by Debtor's father would appear on Debtor's or Montevideo Auto Center's financial statement.  In response, Debtor testified:  "Because at the time, I was the treasurer of that um … company that he had and I … beings at that time I was a portion--portional owner."  Although Debtor admitted that he owned 25% of Persson Investments LLC at the time he provided the information on the financial statement, he claimed he "gave up" his interest in the company the "weekend before COVID hit" in March 2020.  When asked why he gave up his interest, Debtor explained that, at the time he "gave up" his interest, "I just did not do anything with it and it was not really my company to start with."  Debtor provided no documents to the Trustee showing Debtor transferred his 25% interest to his father.  Debtor did not disclose the purported transfer of his 25% interest in Persson Investments LLC on his original schedules and statements or in the amended schedules he filed on March 11, 2021.

At trial, Debtor testified that Persson Investments is his father's real estate holding company that leased space.  He emphasized that he did not invest any money into the business, and his father did not involve him in the management of it.  Debtor acknowledged that he signed an "Operating and Member Control Agreement" on January 1, 2020,[14] showing that he was a member of Persson Investments LLC, who owned a 25% share.  The agreement also shows a signature above the name "Dan Persson," who owned 75% of the company according to the agreement.  Id.  Debtor

_____

[14] In June 2021, Debtor provided a copy of the Operating and Member Control Agreement to the Trustee.

claimed, however, that he and his father never created this limited liability company, and the agreement was not an "originating document."  He explained that his brother filled in blanks on a template to create the Operating and Member Control Agreement and, while they intended to form a company, they never created it.  Although he listed Persson Investments LLC on his Statement of Financial Affairs, Debtor maintains he was never told he had an interest in the limited liability company and believes he did not own an interest in it.  Instead, Debtor claimed Dan Persson formed a different entity, Persson Investments Inc.  Debtor testified he had no role or involvement in Persson Investments Inc.

Dan Persson, who also testified at trial, denied that he signed the Operating and Member Control Agreement for Persson Investments LLC, claiming that he had never seen the document before his deposition in this case, and the signature on page 22 "doesn't look like [my signature]."  On cross examination, Dan Persson conceded that he may have recognized his signature on the agreement during a deposition conducted by the Trustee, but he changed his testimony at trial, claiming it "doesn't look like it and I'm seeing it right now here and it doesn't kinda look like it's mine at all so . . . the more I look at it . . . nope. And I don't recall signing it so . . . ."

Consistent with Debtor's testimony, Dan Persson confirmed that he created Persson Investments Inc. in 2019.  He also testified that the corporation owns the real estate and building located at 7038 Highway 7 SW, Montevideo, Minnesota, and that Debtor never owned an interest in the corporation.  He conceded that "it was originally anticipated" Debtor might be an owner or member of the corporation if Debtor had paid him "$50,000 for 25%."  When asked, "Where did that $50,000 number come from?"

Dan Persson testified, "From a loan," suggesting that Debtor's ownership interest in the corporation depended on whether Debtor reimbursed Dan Persson for the $50,000 loan he provided in September 2019.  Since he received no payments toward this debt, Dan Persson claimed that Debtor is not an owner—and has never been an owner—of Persson Investments Inc.

No party offered the title to the real estate located at 7038 Highway 7 SW, Montevideo, Minnesota, showing which person or entity owned it.  Likewise, neither party offered articles of incorporation or a corporate membership agreement at trial.  However, Debtor's counsel acknowledged Debtor's interest in the corporation in an email he sent to the Trustee on June 22, 2021.  Debtor's counsel explained:

> Mr. Persson never considered himself to be an owner of Persson Investments because he put no money into it.  Since he never considered himself to be an owner, he never thought that he transferred ownership in the entity.  However, upon my review of the documents, it appears that Robert was originally included as a 25% owner of the corporation.  Attached is the "2019.9.25 Certificate of Incorporation" which shows Robert as one of the Incorporators."

Ex. 20.

On August 6, 2021, Debtor amended his Statement of Financial Affairs to disclose that he transferred his 25% interest in Persson Investments Inc. to Dan Persson.  Notes on the amendment provide, "Debtor was initially listed as a 25% owner but never made any capital contributions so [D]ebtor decided he would not be an owner; no documentation."  Ex. 3 at 22.  In describing property received or debts paid in exchange for the transfer, Debtor noted, "Release from obligation to pay capital contribution" in 2020.  Id.  The Trustee claims his investigation prompted Debtor to disclose the transfer.

15

At trial, the Trustee questioned Debtor about his August 2021 amended Statement of Financial Affairs representing that Debtor transferred his 25% interest in Persson Investments Inc. to Dan Persson.  In response, Debtor testified that he did not reimburse Dan Persson for the $50,000 "investment" Dan Persson gave to Debtor for Montevideo Auto Center operating expenses, so Debtor transferred his interest in Persson Investments Inc. back to Dan Persson.  Despite this explanation, Debtor testified that he never believed he owned a 25% interest in Persson Investments Inc. He claimed he listed the transfer in his Statement of Financial Affairs because the Trustee declared Debtor "would have to include this as a transfer even though I didn't ever pay my money in to be part of it."  The Trustee purportedly insisted that Debtor list his interest in Persson Investments because Debtor "had a document that was worth nothing" that led the Trustee to believe Debtor owned 25% of the company.  Notably, the August 2021 amended Statement of Financial Affairs, like the original Statement, shows Debtor is a member of Persson Investments LLC.  Debtor did not disclose that he was a member of Persson Investments Inc.

After the Trustee highlighted the inconsistencies in Debtor's representations regarding Persson Investments, Debtor maintained he answered the Trustee's questions, and he repeatedly agreed with his attorney who characterized the situation as "unclear."

     5.    <u>Tax Refunds and Tax Debt</u>

In response to question 28 on Schedule A/B filed January 31, 2021, "Tax refunds owed to you," Debtor answered, "No."  Ex. 1 at 14.  At trial, Debtor testified that he did not know he would receive tax refunds on the date he filed his bankruptcy petition.  To

16

the contrary, he thought he would owe a tax debt for reporting period 2020.  He also maintained he did not know he would owe taxes for the 2018 reporting period.

On February 2, 2021, two days after the petition date and more than a month before the first Meeting of Creditors, the Trustee sent Debtor's counsel an email, advising Debtor that "he needed to see" Debtor's 2020 tax return and the 2018, 2019 and 2020 tax returns of the entities in which Debtor held an interest.  Ex. 15.  On the same day, Debtor (via his attorney) sent an email to the Trustee attaching Debtor's 2018 tax return and representing:  "I am told that 2019 will be completed this week.  We will get it to you when we receive it."  Doc. 26; Ex. 16.  Several days later, Debtor received an IRS Notice of Deficiency advising Debtor he owed $6,688 for tax year 2018, along with a "substantial tax understatement penalty" of $502. Doc. 26, Ex. 33.

In February 2021, Debtor "self-prepared" his 2019 federal and state tax returns using FreeTax USA and mailed them because his attempt to file electronically failed. He provided a copy of these tax returns to the Trustee on February 18, 2021.  The tax returns show Debtor expected a federal tax refund of $3,954 and a state tax refund of $1,748.

Also in February 2021, Debtor "self-prepared" his 2020 tax returns using TurboTax.  Although he had used TurboTax "many times before," he claims he inadvertently filed his 2020 federal and state tax returns on or about February 11, 2021. Debtor testified that he did not intend to file these tax returns because he did not have all the information he needed to file a true and accurate return.  Although Debtor acknowledged that he was comfortable using the TurboTax software and the return

17

completion process included at least two steps, he maintains that he did not know he
had inadvertently filed his 2020 tax returns.

At the first and subsequent Meetings of Creditors, the Trustee asked Debtor
when he planned to file his 2020 tax returns.  In response to the Trustee's inquiry at the
February 2021 Meeting of Creditors, Debtor represented that he would file his 2020 tax
returns as soon as possible; he expected to finish them within a week.  Debtor
explained that, at the time, he did not possess all the financial information from his
business necessary to complete the 2020 tax returns.  Debtor testified that some of the
documents were located at Montevideo Auto Center, but Debtor did not have access to
the shop because the Trustee had changed the locks.  He also explained that some of
the information was stored in the software system he used for Montevideo Auto Center,
and Debtor did not have access to this data because he owed an $8,000 debt to CDK
Global, LLC, who refused to release the information.  Debtor claims he did not know he
had inadvertently filed his 2020 tax returns when he testified at the Meetings of
Creditors.

At the February 2021 Meeting of Creditors, the Trustee offered to assist Debtor
with his efforts to gather information from Montevideo Auto Center and CDK.  The
Trustee provided Debtor and his family access to Montevideo Auto Center buildings,
sent Debtor a zip drive of data from CDK and returned documents to Debtor for his use
in preparing the 2020 tax returns.

At the end of the February 2021 Meeting of Creditors, the Trustee specifically
described the taxes and cash, and warned, "Okay, um, I give people some leeway. If
there is anything else that isn't fairly listed, Mr. Ahlgren is going to make amendments

18

and you're going to list them, and if I find out 30 days from now there's something else that didn't get listed that's material, that's going to be viewed as a violation of your oath." Doc. 26.  At trial, the Trustee maintained that his admonition related to disclosure of all property, not just cash and tax refunds.

On March 11, 2021, Debtor filed Amended Schedules disclosing anticipated tax refunds for 2019 in the sum of $5,702 ($3,954 federal and $1,748 state) and exempting these refunds.  He also disclosed anticipated tax refunds in an unknown sum for 2020.

Six days later, Debtor received a stimulus payment in the sum of $5,600 via direct deposit into the joint Cornerstone Bank account he holds with his wife.  The bank statement referred to the payment as "IRS TREAS 310 TAXEIP3."  Doc. 26; Ex. 47.

On April 13, 2021, Debtor received his 2020 Minnesota state tax refund via direct deposit into the same joint account.  The bank statement referred to the $2,191 payment as "MN DEPT OF REVEN MNSTTAXRFD XXXXX4656."  Doc. 26, Ex. 47. Eight days later, Debtor received his 2020 federal tax refund via direct deposit into the joint account.  The bank statement referred to the $12,770 payment as "TAX PRODUCTS PE1."  Doc. 26, Ex. 41.

Despite online access to the joint bank account, Debtor does not recall noticing the April tax refund deposits when they arrived.  Debtor testified that he reviews his bank account balance two or three times a month, typically right after pay day to ensure his compensation is properly deposited and again at the end of the month to ensure automatic payments are processed.  He also looks at the account balance to make sure it is not negative.  More specifically, Debtor claims he reads the "instant balance" at the

top of the screen, but he does not review the detail because he did not "have a consistent PIN," explaining that his wife had the "PIN."

Since the Persson family moved from Minnesota to North Dakota in 2020, Ms. Persson has handled the family finances, including managing their joint bank account. She testified that she checks the account weekly, sometimes more often, using an online application on her cell phone and on a personal computer.[15]  When the account is low on funds, she talks to Debtor about the situation.  She claimed that she did not notify Debtor of large deposits into the account, other than deposits related to his compensation.

Ms. Persson spoke with Debtor about their anticipated 2019 tax refunds and she knew about the March and April deposits described above, but she testified that she did not discuss these deposits with Debtor.  Ms. Persson explained that Debtor told her, "There was some amount of money that was coming in," and she was not supposed to transfer or touch it.  She did not know when he asked her not to spend the money and she did not know why she was not supposed to transfer or touch the funds, but she denied that the restriction was related to Debtor's bankruptcy case.

Review of the Cornerstone Bank joint bank account statement reveals several withdrawals within a month after the 2020 tax refunds appeared in Debtor's and Ms. Persson's joint account:

| | | |
|---|---|---|
| 4/23/2021 | coinbase.com | $200 |
| 4/26/2021 | coinbase.com | $250 |
| 4/26/2021 | coinbase.com | $500 |
| 4/26/2021 | coinbase.com | $1,000 |

---

[15] Ms. Persson testified that she does not think she receives paper copies of the Cornerstone Bank statement in the mail but conceded that she "gets stuff from banks, but I just . . . um . . . like, I never look at them."

20

| | | |
|---|---|---|
| 4/26/2021 | coinbase.com | $1,000 |
| 4/27/2021 | Stash Capital | $100 |
| 4/30/2021 | Webull Financial ACH | $1,000 |
| 4/30/2021 | Webull Financial ACH | $2,000 |
| 5/5/2021 | coinbase.com | $1,000 |
| 5/11/2021 | Stash Capital | $200 |
| | | $7,250 |

Ex. 41.  Stash Capital refers to an IRA account Ms. Persson established in her name.

Debtor and Ms. Persson both testified that the transfers to coinbase.com and Webull

Financial relate to Ms. Persson's cryptocurrency investments.  Ms. Persson testified that

her sister's brother-in-law profited from investing in cryptocurrency, and she hoped to

earn some money and save it.  Although Ms. Persson conceded that she used Debtor's

email address for her Coinbase cryptocurrency account transactions and received

Coinbase statements at this email address, she and Debtor maintained Debtor did not

have access to the Coinbase account.  Ms. Persson explained that Debtor granted her

access to his email account, which she is "pretty sure" he no longer uses.  Debtor also

claims he did not know about the Coinbase, Webull Financial or Stash Capital

investment accounts until December 2021.  When asked why she hid her investments

from her husband, Ms. Persson testified, "I don't know."

At trial, Ms. Persson testified that there is no longer money in her investment

accounts.  She explained that their family needed the money for expenses, compelling

her to withdraw the funds a short time after she invested them.

Debtor did not share information about the 2020 tax refunds with the Trustee at

the Meetings of Creditors despite the Trustee's repeated inquiries seeking the status of

Debtor's efforts to prepare his federal and state tax returns.  According to Debtor, he

understood his obligation to disclose this information, but he did not do so because he

did not know he had received the refunds.  His testimony is consistent with his October 28, 2021, responses to the Trustee's interrogatories in which he disclosed anticipated refunds resulting from 2019 and 2020 tax returns but claimed he had not received "any tax refunds" since the day he petitioned for bankruptcy relief.

In mid-May 2021, the Trustee sent an email asking if Debtor wanted any documents left at Montevideo Auto Center.  The Trustee received no affirmative response.  Given that Debtor's father and sister had sorted through the documents stored at Montevideo Auto Center and took what they needed, the Trustee assumed that Debtor had access to all the documentation necessary to complete his 2020 tax returns.

During the July 2, 2021, Meeting of Creditors, "the Trustee demanded that the Debtor provide draft tax returns if he couldn't provide final tax returns."  Doc. 26.  More specifically, the Trustee asked, "Will you have your accountant provide me the current draft?  State return as well."  At the end of the meeting, the Trustee repeated his request for a draft or final tax return.

On July 6, 2021, Debtor (through his attorney) sent the Trustee an email with a draft of Debtor's 2020 state and federal tax returns attached.  A large and obvious watermark covered the draft returns.  In the email, Debtor's counsel advised the Trustee that Debtor had not yet obtained data sufficient to complete the business income portion of the return.  At trial, Debtor testified that he recalled preparing and providing the draft 2020 tax returns and providing them to the Trustee, but he was not sure if he started from scratch or whether he received assistance from Tami Vigen (a paid tax preparer with Liberty Tax) or her assistant, John Bates.  Debtor thought Vigen told him to "fill in

22

as much as possible" and helped him prepare the draft return.  Debtor conceded that the draft 2020 tax returns were inaccurate, but he claimed that the Trustee threatened to pursue dismissal of his bankruptcy case or a nondischargeablility action and allegedly told Debtor that draft tax returns that were "way off" were better than nothing.

The Trustee understood that a tax professional prepared the draft tax returns Debtor sent.  He testified that the returns looked professionally prepared, and he observed that the returns included substantial business information, suggesting to him that a professional prepared them.  Later, the Trustee contacted Vigen, who reportedly told the Trustee that she had not prepared a draft return for Debtor.

On or about July 16, 2021, Vigen completed Debtor's 2020 tax returns. When she attempted to file the tax returns, the IRS rejected the electronic filing. Consequently, she provided Debtor with a paper copy, and he sent it to the IRS.  Debtor provided the Trustee with a copy of Debtor's 2020 tax return on August 5, 2021.[16]  On August 6, 2021, Debtor filed Amended Schedules that reflected the expected tax refunds as shown in the 2020 tax returns completed by Vigen.

Given that Debtor's tax return showed an expected refund, the Trustee sent the IRS a tax refund intercept sometime in July or August 2021, seeking direct payment to

---

[16] The Trustee testified that he compared the draft tax return with the return Tami Vigen prepared and noticed inconsistencies that raised concerns about the accuracy of the information Debtor was providing, including a $5,450 difference in the tax refund. He also highlighted the fact that the IRS Proof of Claim totaling $8,263.45 is inconsistent with the information Debtor provided.  For example, the IRS Proof of Claim provides that Debtor owes $2,510 in 2018 taxes and $209.56 in interest, which is inconsistent with Debtor's representation that he owed $6,688 in taxes for the 2018 reporting period.  The 2019 federal tax return Debtor filed shows that he requested a $3,954 refund.  The IRS proof of claim shows "1 D-estimated-see note $5,000 due tax due" for the 2019 reporting period.

the bankruptcy estate for any tax refunds the IRS planned to issue to Debtor.[17]

According to the Trustee, he received a letter from the IRS advising that it had already

issued a 2020 federal tax refund, so there was no refund to intercept.  The letter

prompted the Trustee to request a tax transcript.  On December 8, 2021, the Trustee

obtained a tax transcript for the tax period that ended December 31, 2020, which

showed that the IRS issued a $12,940 refund to Debtor on April 21, 2021.  This

information conflicted with Debtor's representations that he had not filed his 2020 tax

returns or received tax refunds in or before April 2021.

To resolve the conflicting information, Debtor authorized the Trustee to

communicate directly with his tax preparer.  "In response to the Trustee's questions,

Vigen and Debtor investigated and determined that the February TurboTax return (Ex.

40) had, in fact, been filed."  Doc. 26.

At trial, Debtor claimed that he did not learn that he had inadvertently filed his

2020 tax returns in February 2021 until his attorney notified him about the Trustee's

receipt of the tax transcript in December 2021.  Likewise, he maintained he did not

know that he had received his 2020 tax refunds deposited in April 2021 until the same

time in December 2021.

On December 9, 2021, Liberty Tax prepared an amended federal tax return to

correspond with the 2020 tax return previously prepared by Vigen.  Debtor filed

Amended Schedules on January 13, 2022, to disclose the 2020 tax refunds received

and "to exempt them to the extent possible."  Doc. 26, Ex. 48.

---

[17] The Trustee maintained Debtor's 2019 and 2020 tax refunds are estate
property, and he planned to administer these assets unless Debtor properly exempted
them.

Just prior to trial, Debtor sent the Trustee an $11,700 check for the sum of the 2020 tax refund he received in April 2021 less the sum of the allowed exemption. Debtor borrowed these funds from his employer.

6.    Transfer of Trailers and a Bobcat Skid-Steer and Attachments

In response to question 18 in the Statement of Financial Affairs, Debtor represented that he did not sell, trade or otherwise transfer any property to anyone, other than property transferred in the ordinary course of his business or financial affairs, within two years before he petitioned for bankruptcy relief.  Debtor testified at trial that this was true at the time he filed his bankruptcy petition.

The financial statement prepared for the Small Business Administration showed Debtor owned personal property which he valued at $33,000.  The Trustee requested a list of the items Debtor included in this line item.  Debtor sent a list, which included trailers and other equipment.  During the May 6, 2021, Meeting of Creditors, the Trustee questioned Debtor regarding the disposition of these items and requested documentation regarding their disposition.

At the May 28, 2021, Meeting of Creditors, the Trustee asked Debtor specific questions about these items.[18]  Debtor testified that he gave his brother, Nate Persson, a two-car Kaufman trailer in lieu of compensation.  The record shows Montevideo Auto Center employed Nate Persson prior to closing.  Ex. 23, 24.  Nate Persson assisted Debtor and the company with liquidation details and accepted the trailer in late October

---

[18] Debtor also provided written explanations for the disposition of these assets in discovery responses.

2020 as compensation for his work in late September and October 2020 because the company had no other resources to pay him.

Although Debtor suggested that he personally owned the trailer at the Meeting of Creditors, a Mid-State Auto Auction receipt shows that Montevideo Auto Center purchased the trailer, and there is no documentation establishing that Debtor owned it before the company transferred it to Nate Persson. Montevideo Auto Center used the trailer, pulled the trailer with vehicles it owned and paid for maintenance of the trailer. At trial, Debtor maintained the trailer was Montevideo Auto Center's asset. Debtor did not disclose this business asset transfer in his original or amended schedules or statements.

At the May 28 and July 2, 2021, Meetings of Creditors, Debtor also testified that he sold a homemade trailer and a Bobcat skid-steer and attachments to his brother-in-law, Ross Winter. Although Debtor claimed he owned this equipment, he deposited the sale proceeds into Montevideo Auto Center's account. The record shows Winter and Ross Winter Construction paid Montevideo Auto Center $46,500 in September 2020, which Debtor maintains was consideration for the trailer, skid-steer and attachments. See Exs. 4, 25, 26. Debtor testified that Winter paid considerably more than the $15,000 value of the equipment just to be "nice" to Debtor. The Trustee expressed concern about this transaction because Debtor claimed he owned the Bobcat skid-steer and attachments at the July Meeting of Creditors, yet Debtor deposited the proceeds from the sale of this equipment into Montevideo Auto Center's account. At trial, Debtor testified that the equipment was purchased for Montevideo Auto Center, and the dealership owned the equipment and stored it on its property. The Court received no

26

documentation showing whether Debtor or Montevideo Auto Center owned the equipment sold to Winter.

Debtor did not specifically disclose the transfer of the equipment to Winter in his original or amended schedules or statements, but he disclosed that he transferred cash and other property to Montevideo Auto Center in the amended Statement of Financial Affairs he filed on August 6, 2021.  The evidence shows that Debtor often referred to dealership assets as personal property.

Also at the May 28, 2021, Meeting of Creditors, Debtor testified that Shane Heck purchased a flatbed Kaufman trailer.  At trial, Debtor clarified that Montevideo Auto Center acquired the Kaufman trailer through a trade-in, and the company transferred it to Heck as partial repayment of the funds he invested in the business.  Debtor offered evidence showing Heck transferred money to Montevideo Auto Center.  Ex. 27.  Debtor did not specifically disclose this business asset transfer in his original or amended schedules or statements.

## III.   CONCLUSIONS OF LAW

### A.   <u>Jurisdiction</u>

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.   <u>Denial of Discharge Standards</u>

In the Amended Complaint, the Trustee seeks a denial of Debtor's discharge under 11 U.S.C. § 727(a)(2), (3) and (4).  Section 727 of the Bankruptcy Code provides, in relevant part, that the court shall grant a debtor a discharge unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the Bankruptcy Code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a).  Denying a debtor a discharge is a harsh remedy.  Home Serv. Oil Co. v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citation omitted). Therefore, courts construe section 727 strictly in favor of the debtor.  Id.  Even so, a discharge in bankruptcy and the associated fresh start are privileges, not rights.  Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v. Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered new beginning is limited to the honest but unfortunate debtor."  Id.  The cost to the debtor for an unencumbered fresh start is minimal, but it includes honestly and accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.; see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R.

680, 683-84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R.

511, 514 (B.A.P. 8th Cir. 2011)).

     C.    **Denial of Discharge Under 11 U.S.C. § 727(a)(2)(A)**

     To prevail under section 727(a)(2)(A), the Trustee must prove by a

preponderance of the evidence: (1) Debtor's act or actions took place within one year

before the petition date; (2) the act was that of Debtor; (3) Debtor transferred, removed,

destroyed, mutilated or concealed property; and (4) Debtor took these acts with an

intent to hinder, delay or defraud a creditor or the Trustee.  See Georgen-Running v.

Grimlie (In re Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In

re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008).  "'Once a gratuitous transfer is

shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay,

or defraud his creditors.'" Cadlerock Joint Venture II, L.P. v. Sandiford (In re Sandiford),

394 B.R. 487, 490 (B.A.P. 8th Cir. 2008) (quoting The Abbott Bank-Hemingford v.

Armstrong (In re Armstrong), 931 F.2d 1233, 1239 (8th Cir. 1991)).

     The Trustee argues Debtor took numerous steps to transfer and conceal his

property within one year of bankruptcy, including removing kitchen appliances, a hot tub

and a trampoline from his former home in Montevideo and storing them in his father's

building.  At the time Debtor and Ms. Persson moved to West Fargo in October 2020,

the kitchen appliances, hot tub and trampoline were still located at Debtor's former

home in Montevideo.  Debtor's relatives moved the kitchen appliances to Dan Persson's

storage building to ensure they were not sold with the house.  Debtor's relatives moved

the hot tub to Dan Persson's storage building after Debtor learned the hot tub froze and

cracked.  Dan Persson recovered the destroyed trampoline after a windstorm and

moved it to this building as well.  There is no evidence that Debtor gave or transferred

these items to his father.  Rather, both parties understood that Dan Persson stored this property for Debtor and his wife.  Consequently, the issue is whether Debtor concealed these items by failing to disclose them on his schedules.

The Trustee claims that Debtor failed to disclose this property in his schedules, "actively attempt[ing] to put these items beyond the reach of the trustee."  Doc. 40 at 9. In response, Debtor asserts that he had no incentive to conceal these assets because he claimed the household goods exempt on Schedule C, and the cracked hot tub and destroyed trampoline provide no value to Debtor or the bankruptcy estate.

The Court agrees with Debtor that the hot tub, trampoline and appliances in this case are ordinary household goods and furnishings properly disclosed in Schedule A/B and C and claimed exempt under section 522(d)(3).[19]  While the Court does not condone Debtor's failure to list this personal property in the Statement of Financial Affairs as items stored at a place other than his home, it is not convinced that Debtor concealed these items by hiding them or placing them beyond the reach of the Trustee.[20]  Debtor notified the Trustee that his relatives removed the appliances from

---

[19] At trial, the Trustee asserted that Debtor undervalued the items he included in "ordinary household goods and furnishings."  The Trustee did not object to Debtor's exemption or offer evidence showing the value of the household goods exceeded the sum exempt under the statute.  Given Debtor's and Dan Persson's testimony regarding damage to the hot tub and trampoline, the Court finds no reason to question the value claimed, especially since Debtor exempted only his half interest in this personal property.  Accordingly, the Court rejects this argument.

[20] Concealment under section 727(a)(2)(A) or (B) involves placing assets beyond the reach of creditors or withholding knowledge of assets by failing or refusing to divulge information about the existence, ownership or location of the assets.  See, e.g., In re Marcus-Rehtmeyer, 784 F.3d 430, 442 (7th Cir. 2015) (defining concealment as "preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known" (citation omitted)); McCormick v. Sec. State Bank, 822 F.2d 806 (8th Cir. 1987) (finding concealment within the meaning of section

the house in Montevideo at the February 2021 Meeting of Creditors, and he amended

his schedules to disclose their location on March 11, 2021.  Debtor's relatives did not

move the hot tub and trampoline from the Montevideo house until after they were

destroyed, which does not support the Trustee's claim that Debtor sought to move these

items beyond the reach of creditors.  To the contrary, it appears that Debtor's relatives

were attempting to help Debtor by removing unwanted items from the Montevideo

property before it sold.  The Trustee failed to meet his burden of proving a transfer or

concealment with regard to this property.

---

727(a)(2)(A) and noting, "It is admitted by appellant in his testimony that he lied to the
bank when he claimed to be unable to make any payment on the note and that he did
not disclose to the bank that $55,000 to $60,000 was subject to his disposition at that
time. . . . But concealment from the creditor alone, (here the appellee bank), is sufficient
to constitute concealment under the statute when the intent to hinder and delay
collection is clear, as it is in the case at bar."); Buckeye Ret. Co., LLC v. Swegan (In re
Swegan), 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008) ("To give effect to each word in the
statute, as we must, we conclude that concealment as used in § 727(a)(2)(A) includes
the withholding of knowledge of an asset by the failure or refusal to divulge information
required by law to be made known."); R.I. Depositors Econ. Prot. Corp. v. Hayes (In re
Hayes), 229 B.R. 253 (B.A.P. 1st Cir. 1999) (defining concealment under section
727(a)(2)(A) as "hiding or withdrawing property from observation, preventing the
discovery of property or withholding knowledge of the existence, ownership or location
of property." (quotation and citation omitted)); Gasson v. Premier Capital, LLC (In re
Gasson), 2021 WL 1222151, at *5 (S.D.N.Y. Mar. 31, 2021) ("To ascertain whether a
concealment for the purposes of Section 727(a)(2) has occurred, courts ask: '[d]id the
[debtor] place assets beyond the reach of creditors or withhold knowledge of assets by
failing or refusing to divulge information to which creditors were entitled?'" (citation
omitted)); Barbacci v. Miller (In re Miller), 2020 WL 2554232, at *3 (Bankr. N.D. Ohio
May 19, 2020) ("A 'concealment as used in § 727(a)(2)(A) includes the withholding of
knowledge of an asset by the failure or refusal to divulge information required by law to
be made known.  Under this standard, concealment occurs when a debtor fails to
adequately and truthfully answer a question at a state-court debtor's examination, at a
341 meeting of creditors, within a bankruptcy petition, or in other similar situations.'"
(citations omitted)); Flush Sav. Bank v. Vidro (In re Vidro), 497 B.R. 678, 686 (Bankr.
E.D.N.Y. 2013) ("'Concealment refers to placing assets beyond the reach of creditors or
withholding pertinent information, and need not involve an actual transfer.'" (citation
omitted)).

In support of his section 727(a)(2) claim, the Trustee also argues Debtor

transferred his interest in Persson Investments to Dan Persson in March 2020.  In

response, Debtor argues his interest in the corporation is nonexistent or valueless

because he made no capital contributions to the corporation and his interest in the

limited liability company is nonexistent because he and Dan Persson never created it.

The Court is troubled by the inconsistent and continually evolving testimony

regarding Persson Investments.  Debtor disclosed his interest in Persson Investments

LLC in his original Statement of Financial Affairs filed on the same day he petitioned for

bankruptcy relief.  In correspondence to the Trustee just two days after Debtor filed his

petition, Debtor's counsel explained that Debtor's father owned Persson Investments,

and counsel understood that Dan Persson named Debtor as an officer for estate

planning purposes.  At the May 28, 2021, Meeting of Creditors, Debtor testified that he

owned a 25% interest in Persson Investments LLC, but he claimed that he "gave up" his

interest in March 2020 because he "just did not do anything with it and it was not really

[his] company to start with."  Debtor offered no documentation showing he transferred

his interest to Dan Persson.

Two months after Debtor purportedly transferred his interest in Persson

Investments back to Dan Persson, Debtor signed the financial statement dated May 5,

2020, showing Debtor held an interest in Persson Investments' real property located at

7038 Highway 7 SW, Montevideo, Minnesota.

In June 2021, Debtor voluntarily produced an Operating and Member Control

Agreement for Persson Investments LLC signed on January 1, 2020.  Debtor conceded

that he signed this agreement and disclosed the limited liability company on his

32

Statement of Financial Affairs, but he claimed at trial that he and Dan Persson never "created" the limited liability company. Dan Persson denied that he signed the agreement, although he had admitted in his pretrial deposition that the signature above his name was his signature.

Also in June 2021, Debtor (through counsel) sent the Trustee an email attaching a copy of the Certificate of Incorporation for Persson Investments Inc. dated September 25, 2019, which showed that Debtor was one of the incorporators. Information in the same email suggests Debtor owned 25% of the corporation. Despite these documents, Debtor's counsel advised the Trustee in the email that Debtor never thought he transferred ownership in Persson Investments because he "never considered himself to be an owner." Yet, Debtor amended his Statement of Financial Affairs three months later to disclose that he transferred his interest in the corporation—Persson Investments Inc.—to Dan Persson. More specifically, Debtor disclosed "Debtor was initially listed as a 25% owner but never made any capital contributions so debtor decided he would not be an owner; no documentation." At trial, Debtor testified that he had no role or involvement in Persson Investments Inc. and did not own a share of the corporation.

Dan Persson disputed Debtor's ownership interest. He testified at trial that he created a corporation in 2019, not a limited liability company, and he claimed that Debtor never owned an interest in Persson Investments Inc. Dan Persson maintained, "It was originally anticipated" Debtor might be an owner or member of the corporation if Debtor had paid him "$50,000 for 25%," and suggested Debtor's ownership interest in the corporation depended on whether Debtor reimbursed him for the $50,000 loan Dan Persson personally provided to Debtor for Montevideo Auto Center working capital.

33

Neither party offered the certificate of incorporation, articles of incorporation or a membership agreement at trial. Consequently, it is not clear whether corporate documents linked Debtor's ownership interest to a capital contribution.

The Court finds Dan Persson's testimony self-serving and lacking credibility. Debtor's testimony is riddled with inconsistencies, giving the Court reason to doubt his veracity as well. It is not clear whether the Persson Investments that reportedly owns the real property located at 7038 Highway 7 SW, Montevideo, Minnesota, is a corporation or a limited liability company. Likewise, the Court received conflicting evidence regarding whether Debtor owns or owned an interest in Persson Investments.

After considering all the documents, testimony and circumstances related to Persson Investments, the Court finds that the greater weight of the credible evidence shows that Debtor owned a 25% interest in Persson Investments when he petitioned for bankruptcy relief. The Court is not convinced by either Dan Persson's or Debtor's testimony suggesting Debtor never owned an interest in the limited liability company or corporation. Dan Persson's claim that Debtor's interest in Persson Investments depended on Debtor's repayment of Dan Persson's $50,000 loan to Debtor for Montevideo Auto Center is suspicious given that capital investments in two separate entities are conflated with personal loans and debt. Debtor's claim that he never owned an interest in Persson Investments is belied by his representation on his original and amended Statement of Financial Affairs and the financial statement prepared for the Small Business Administration dated May 5, 2020, in which Debtor represented that he owned an interest in the building and real property reportedly owned by Persson Investments. Additionally, the email reference to the Certificate of Incorporation

34

showing Debtor is "one of the incorporators" of Persson Investments Inc. together with the Operating and Member Control Agreement showing Debtor owned a 25% interest in Persson Investments LLC demonstrate that Debtor owned an interest in these entities.

The Court also finds that the greater weight of the evidence shows Debtor did not transfer his 25% interest back to Dan Persson in March 2020.  If Dan Persson named Debtor as an officer and gave him a 25% interest for estate planning purposes, Debtor's purported transfer of his interest back to his father would have defeated this purpose. Also, the email from Debtor's counsel to the Trustee in June 2021 indicates Debtor never thought he transferred ownership of Persson Investments.  Debtor's representations that he owned an interest in Persson Investments' real property on the May 2020 financial statement also serve as grounds to mistrust Debtor's claim that he transferred his interest in either the corporation or limited liability company in March 2020.  Finally, lack of documentation showing this purported transfer supports this conclusion.

Accordingly, the Court finds that Debtor owned a 25% interest in Persson Investments LLC and Inc. on the day he petitioned for bankruptcy relief; he did not transfer this interest to Dan Persson in 2020.  The Trustee failed to meet his burden of showing Debtor transferred, removed, destroyed, mutilated or concealed property listed in his trial briefs or included in his Amended Complaint within one year before the petition date.[21]  His section 727(a)(2)(A) cause of action is dismissed.

---

[21] In his Amended Complaint, the Trustee alleged Debtor failed to disclose $1,800 in cash, tax refunds and earned but unpaid compensation and claims these failures to disclose support his section 727(a)(2) cause of action.  The Trustee does not include these allegations in his pretrial or posttrial argument regarding section 727(a)(2), presumably electing to highlight these omissions under section 727(a)(4).  Even if the

### D.    Denial of Discharge Under 11 U.S.C. § 727(a)(4)

Section 727(a)(4)(A) bars the entry of discharge if a debtor knowingly and

fraudulently made a false oath or account in or in connection with a case.  11 U.S.C. §

727(a)(4)(A).  To meet his burden under this subsection, the Trustee must prove by a

preponderance of the evidence that "(1) Debtor made a statement under oath; (2) the

statement was false; (3) Debtor knew the statement was false; (4) Debtor made the

---

Trustee had pursued these allegations in pretrial and posttrial argument, the Court is not
persuaded that they support the Trustee's section 727(a)(2) cause of action.

The Trustee offered evidence that Debtor failed to disclose $1,800 in cash that
Ms. Persson deposited into their joint bank account a few days after Debtor filed his
petition.  During the February Meeting of Creditors, Debtor conceded that the money his
wife deposited was his money, although Ms. Persson disputes this testimony.  While
Debtor failed to disclose this cash on the schedules he filed in January 2021, he
disclosed it at the February 2021 Meeting of Creditors and promptly amended his
schedules to disclose the funds on March 11, 2021.  The Court is not convinced Debtor
concealed this money by hiding it or placing it beyond the reach of the Trustee.  To the
contrary, Ms. Persson's decision to deposit the money, converting it from cash (easy to
dissipate and nearly impossible to trace) to a deposit in the Perssons' bank account
(easier to trace and harder to dissipate without detection), suggests Debtor and Ms.
Persson were trying to be transparent.

The Court also rejects the Trustee's allegation that Debtor concealed $8,593 in
earned but unpaid compensation by failing to disclose it on the schedules he filed in
January 2021.  The evidence shows that Debtor's compensation is based on
commissions, and he did not know the sum of the commissions he earned on the
petition date.  In fact, he did not learn the sum of his earned but unpaid compensation
until he received his February 6, 2021, earning statement almost a week after he filed
his petition.  Eight days before the February Meeting of Creditors, Debtor voluntarily
disclosed his bank statement showing his compensation, and he disclosed this sum
during the February 2021 Meeting of Creditors.  Less than two weeks later, Debtor filed
Amended Schedules listing $8,593 in earned but unpaid wages on Schedule A/B.  Doc.
26; Ex. 2.  This conduct does not show concealment.

Finally, Debtor did not prepare or file his 2019 and 2020 tax returns until after he
petitioned for bankruptcy relief.  Consequently, the Trustee's allegations regarding
Debtor's alleged concealment of tax refunds is properly addressed under section
727(a)(2)(B).

statement with fraudulent intent;[22] and (5) the statement related materially to Debtor's bankruptcy case." Home Serv. Oil Co. v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citing Kaler v. Charles (In re Charles), 474 B.R. 680, 684 (8th Cir. B.A.P. 2012)).

Section 727(a)(4)(A) "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind. The debtor's petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." In re Cecil, 542 B.R. at 453–54 (quoting Korte v. U.S. Internal Revenue Serv. (In re Korte), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (internal quotations omitted)). "The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions." In re Bauer, 298 B.R. at 357.

"Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]" In re Cecil, 542 B.R. at

---

[22] The Trustee may establish the requisite fraudulent subjective intent with direct or circumstantial evidence. See In re Cecil, 542 B.R. at 451; Casamatta v. Holden (In re Holden), 542 B.R. 455, 459 (Bankr. W.D. Mo. 2015). The Court regards assertions, whether statements or omissions, made with reckless indifference to the truth as intentionally false. See In re Cecil, 542 B.R. at 451. "While courts are often understanding of a single omission or error resulting from an innocent mistake, multiple inaccuracies or falsehoods may rise to the level of reckless indifference to the truth which is the functional equivalent of intent to deceive." Horizon Fin. Bank v. Borstad (In re Borstad), 550 B.R. 803, 833 (Bankr. D.N.D. 2016) (citations omitted). In this regard, "[T]he existence of multiple falsehoods, taken together with a failure on the part of the debtor to correct all known inconsistencies, omissions, and misstatements upon first amendment, constitutes reckless indifference to the truth and, thus, the requisite intent to deceive." Id. at 833–34 (citing Kaler v. McLaren (In re McLaren), 236 B.R. 882, 895 (Bankr. D.N.D. 1999)).

454.  The disclosure requirement has implications beyond the administration of each individual bankruptcy case because "failure to comply with the requirements of disclosure and veracity necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole."  In re Korte, 262 B.R. at 474 (quoting Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997) (internal quotations omitted)). As the Bankruptcy Appellate Panel recognized:

> Bankruptcy provides debtors with a great benefit: the discharge of debts. The price a debtor must pay for that benefit is honesty and candor.  If a debtor does not provide an honest and accurate accounting of assets to the court and creditors, the debtor should not receive a discharge.

In re Cecil, 542 B.R. at 454 (citation omitted).

The Trustee argues Debtor knowingly omitted information or made material misrepresentations in his schedules and Statement of Financial Affairs.  Specifically, he asserts Debtor failed to list kitchen appliances, a trampoline and a hot tub on Schedule A/B and to disclose that he stored these items at his father's storage building in his Statement of Financial Affairs.  He also claims Debtor failed to disclose $1,800 in cash, 2018 tax liabilities, expected tax refunds for 2019 and 2020, and the transfer of his interest in Persson Investments to his father, trailers and a Bobcat skid-steer and attachments to his brother-in-law in his schedules and statements.  Additionally, the Trustee alleges Debtor falsely testified at the Meetings of Creditors in violation of section 727(a)(4).

1.   Statement Under Oath

A debtor's signature on the bankruptcy petition, schedules and statements, made under penalty of perjury, are declarations which have the force and effect of "oaths" of

38

the kind contemplated by section 727(a)(4)(A).  In re Charles, 474 B.R. at 684 (citation

omitted).  Likewise, Debtor's testimony at the Meetings of Creditors are statements

under oath for purposes of section 727(a)(4).  In re Charles, 474 B.R. at 684 (B.A.P. 8th

Cir. 2012).

      Debtor acknowledged that he signed his bankruptcy petition under penalty of

perjury, which included his schedules and statements, and he testified under oath at the

numerous Meetings of Creditors.  The Trustee satisfied his burden of proof under the

first element of section 727(a)(4)(A).

          2.    <u>False Statement that Debtor Knew was False and Made with
               Fraudulent Intent</u>

      For the reasons discussed in the Court's analysis of the section 727(a)(2)(A)

claims, the Court found that Debtor did not transfer his interest in Persson Investments

to Dan Persson.  The Trustee did not meet his burden of proving that Debtor

fraudulently omitted this transfer from his schedules and statements.

      Debtor's testimony that he transferred his interest in the corporation or limited

liability company while maintaining his claim that he never owned an interest in these

entities raises concerns about his veracity during the Meetings of Creditors and trial,

however.  Debtor's prevarications leave the Court with the impression that the purported

transfer of his interest in Persson Investments back to Dan Persson was a

manufactured narrative designed to protect his father's investment.  Evidence

supporting this conclusion includes: lack of documentation showing this alleged transfer

in March 2020, Debtor's claim to owning an interest in Persson Investments or its real

property on a financial statement dated in May 2020, and the representations in the

June 2021 email between Debtor's counsel and the Trustee showing Debtor never

believed he transferred his interest in Persson Investments.  The timing of Debtor's
disclosure of the Persson Investments transfer—a few weeks after the Trustee began
inquiring about the assets listed on the May 2020 financial statement—also gives the
Court pause.  While Debtor's inclination to protect his father's investment is not
surprising given the circumstances, preferring his father (an insider) over his creditors is
evidence of fraudulent intent.  Accordingly, the Court finds that Debtor's testimony that
he transferred his interest in Persson Investments in March 2020 was a false statement
Debtor knew was false that he made with fraudulent intent.

>    3.    Materiality

A statement is material under 11 U.S.C. § 727(a)(4)(A) if it relates to or concerns
the debtor's business transactions, the debtor's business or personal estate, the
discovery of assets or the existence or disposition of the debtor's property.  Mertz v.
Rott, 955 F.2d 596, 598 (8th Cir. 1992); Georgen-Running v. Grimlie (In re Grimlie), 439
B.R. 710, 717 (B.A.P. 8th Cir. 2010).  Debtor's false testimony about the purported
transfer of his interest in Persson Investments relates to the existence and disposition of
Debtor's property.  His false statements were material.  Accordingly, the Trustee met his
burden of proving Debtor knowingly and intentionally gave false testimony regarding his
purported transfer of his interest in Persson Investments under section 727(a)(4), which
serves as grounds to deny Debtor a discharge.

>    **E.    Denial of Discharge Under 11 U.S.C. § 727(a)(2)(B) and (a)(3)**

Section 727(a)(2)(B) bars entry of discharge if Debtor transferred, removed,
destroyed, mutilated or concealed property of the estate after the petition date with
intent to hinder, delay or defraud a creditor or the Trustee.  See 11 U.S.C. §
727(a)(2)(B).  Section 727(a)(3) bars the entry of discharge if Debtor concealed,

destroyed, mutilated, falsified or failed to keep or preserve any record information, including books, documents, records, and papers, from which Debtor's financial condition or business transactions might be ascertained, and Debtor's actions or failure to act was not justified under the circumstances.  See 11 U.S.C. § 727(a)(3).  Because the Court denies Debtor a discharge under section 727(a)(4), it is not necessary to reach the question of whether Debtor's discharge should also be denied under subsections 727(a)(2)(B) or (a)(3).

### F.   Discretionary Discharge

In his posttrial brief, Debtor argues that the Court should exercise its discretion and grant Debtor a discharge, even if the Trustee met his burden of proving one or more of his claims and causes of action.  Debtor asserts that denial of his discharge will subject Debtor and his family to a "life sentence of debt" they will never be able to fully repay.  Doc. 39 at 2.  "The statutory interest on the Citizens Alliance Bank judgment would be more than Debtor's annual income."  Id.  Debtor emphasizes his efforts to cooperate with the Trustee by providing information and assisting with the liquidation of his assets.  He highlights the fact that no creditors filed a denial of discharge claim, and the United States Trustee did not join in this action.  While recognizing the errors in his schedules, he argues that his conduct is not sufficiently heinous to warrant denial of discharge.

Debtor makes a compelling plea.  The record shows that imprudent agreements with a business associate, inexperience (Debtor was 27 when he opened Montevideo Auto Center) and really bad timing were among the factors that led to Debtor incurring over $1.3 million dollars in unsecured debt—debt so high Debtor claims he will never be

41

able to repay it.  Given the circumstances in the record, including Debtor's support of four children (one of whom has cancer), the Court assumes this is true.

The record also shows that Debtor and his family struggled with financial hardship at the time of trial.  Ms. Persson offered compelling testimony about the Persson family's difficulty meeting their financial obligations, including medical debt arising from their daughter's cancer treatments.  The magnitude of this debt weighs heavily.

In <u>Miami Nat'l Bank of Miami v. Hacker</u> (<u>In re Hacker</u>), 90 B.R. 994 (Bankr. W.D. Mo. 1987), the court recognized authority granting bankruptcy courts "ample discretion" to grant a debtor's discharge despite evidence supporting denial of this remedy.  The court opined:

> It is commonly said, however, that the existence of grounds for the denial of discharge, albeit a condition necessary to the actual denial of discharge, is not a sufficient condition; that it remains within the discretion of a bankruptcy court to grant a discharge even when grounds for denial of discharge are demonstrated to exist. Under this rule, it is appropriate for the court to consider that the debtors' prepetition debt is of such magnitude that denial of a discharge would make life virtually impossible for them. And, in this case, the debtors seek to discharge debts of some considerable magnitude. But this consideration must, in turn be weighed against the degree of heinousness evidenced by the circumstances of the violation of the bankruptcy laws which constitutes the ground for denial of discharge.

<u>In re Hacker</u>, 994 B.R. at 997-98 (footnotes and citations omitted).  In 2002, the Seventh Circuit Court of Appeals cited <u>In re Hacker</u> for the proposition that bankruptcy courts may exercise discretion to grant a discharge even when a creditor demonstrates grounds for denial of discharge, and it observed that the bankruptcy court "likely would have been within its discretion to grant the discharge" to the debtor in the case before it. <u>Union Planters Bank, N.A., v. Connors</u>, 283 F.3d 896, 901 (7th Cir. 2002).  Since then,

numerous courts have recognized bankruptcy court discretion to grant debtors a discharge even when the trustee or creditors prove their claims under section 727, although few of them exercise this discretion.[23]  Despite this caselaw, the Court questions whether this discretion exists.  See United States Trustee v. Jain (In re Jain), 626 B.R. 336 (Bankr. D.N.M. 2021).

---

[23] See Snyder v. Dykes (In re Dykes), 954 F.3d 1157, 1162 (8th Cir. 2020) (recognizing bankruptcy court discretion to deny discharge) (citing Connors, 283 F.3d at 901)); United States Trustee v. Garland (In re Garland), 417 B.R. 805, 810 (B.A.P. 10th Cir. 2009) ("'A decision whether to grant or deny a discharge is in the sound discretion of the bankruptcy court'" (citation omitted)); Alliant Tax Credit VIII v. Singleton, 628 B.R. 835, 845 (Bankr. M.D. Fla. 2021) (noting that it doubted whether debtor intended to hinder, delay or defraud plaintiff, but finding that plaintiff established a transaction satisfying section 727(a)(2)(A), and ruling that "[b]ecause the transfer is de minimis and [plaintiff] prevails on a technicality, the Court will use its discretion and allow the Debtor a discharge under Section 727(a)(2)(A)"); Snyder v. Kohout (In re Kohout), 2021 WL 3195811, at *1 (Bankr. D. Minn. July 28, 2021) (recognizing bankruptcy court discretion to grant discharge even when grounds for denial are shown, but finding plaintiff failed to prove defendant acted with the requisite intent necessary for a denial of discharge); Gargula v. Wright (In re Wright), 618 B.R. 569, 584-85 (Bankr. M.D. Fla. 2020) (finding the United States Trustee met his burden under section 727(a)(2) but granting debtor a discharge because no creditor complained, the actionable transfers were unwound and "Debtor's actions, although wrong, are not heinous enough to deny the discharge of debts exceeding $124 million"); United States Trustee v. Amphone (In re Amphone), 613 B.R. 764, 783-86 (Bankr. D. Kan. 2020) (finding in favor of debtor on the United States Trustee's section 727(a)(3) and (5) claims but noting that, even if the United States Trustee prevailed, the court retains discretion to grant debtor a discharge, and debtor should receive discharge in this case); McDermott v. Petersen (In re Petersen), 564 B.R. 636 (Bankr. D. Minn. 2017) (recognizing bankruptcy court discretion to grant discharge even when grounds for denial are shown, but finding the United States Trustee failed to prove his claims under section 727); United States Trustee v. Cox (In re Cox), 2017 WL 3971834, at *1–2 (Bankr. S.D. Ind. Sep. 7, 2017) (finding the United States Trustee did not meet her burden under section 727 but noting that, even if the United States Trustee had met her burden, the Court would exercise its discretion to find that Debtor should be granted a discharge); McVay v. DiGesualdo (In re DiGesualdo), 463 B.R. 503, 524-25 (Bankr. D. Colo. 2011) (although grounds for denial of discharge existed and there were questions about debtors' good faith and honesty, the court exercised discretion to grant debtors a discharge because debtors' missteps were due, in part, to original counsel's failure to inform and advise, debtors cooperated after retaining new counsel, debtors' age and the magnitude of their debt would result in a severe penalty).

Section 727(a)(4) of the Bankruptcy Code provides that the court shall grant a debtor a discharge unless:

> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> > (A) made a false oath or account[.]

11 U.S.C. § 727(a).  The plain meaning of section 727(a)(4) is that the court shall not grant debtor a discharge if the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account.  11 U.S.C. § 727(a)(4).  The negative-implication canon of statutory construction supports this conclusion.  See In re Jain, 626 B.R. at 342.  This canon provides that "to express or include one thing implies the exclusion of the other or of the alternative."  Id. (citing Scalia & Garner, Reading Law: The Interpretation of Legal Texts, p. 107 (2012) and In re Vaughan, 311 B.R. 573, 579 (10th Cir. BAP 2004)).  "The clear negative implication of § 727(a) is that debtors who come within § 727(a)(1)-(12) do not get a discharge."  Id.

Similar to the court in In re Jain, this Court is disinclined to exercise equitable discretion to grant a discharge when Debtor's conduct falls within the section 727 discharge exceptions.  See id. at 343.  A bankruptcy court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code."  Id. (citing Law v. Siegel, 571 U.S. 415, 421 (2014)).  While the Court may exercise discretion in judging credibility and finding facts, when the facts lead the Court to conclude that a debtor's conduct falls within an exception to discharge, it may not exceed its authority by exercising discretion to grant discharge—even when the outcome appears particularly harsh.  Accordingly, Debtor's request to grant him a discharge despite the evidence supporting the Trustee's section 727(a)(4) cause of action is rejected.

**IV.     CONCLUSION**

For the reasons stated above, Debtor is denied a discharge under 11 U.S.C. §
727(a)(4).  The Trustee's claim under 11 U.S.C. § 727(a)(2)(A) is dismissed.  His
causes of action under 11 U.S.C. § 727(a)(2)(B) and (a)(3) are dismissed without
prejudice because they are moot.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated: May 16, 2022.

Shon Hastings, Judge
United States Bankruptcy Court